## In re German Township School Directors

*W. F. Lane*, for petitioners.

*F. M. Lardin, Anthony Cavalcante,* and *J. K. Spurgeon,* for board of school directors.

DUMBAULD, P. J., November 19, 1942.—. . . This is a proceeding under section 217 of the School Code of May 18, 1911, P. L. 309. The prayer of the petition is for a rule to show cause why all the members of the Board of Directors of the School District of German

Township should not be removed from office. The section empowers the court to remove school directors for refusal or neglect to perform any duty made mandatory on them to perform by the School Code.

The trial judge has found as a fact that the members of this board have failed and neglected to perform duties made mandatory upon them by the code. The situation thus presents the question whether the removal of a school director is mandatory upon the court where it has been found as a fact that there has been neglect by a director in performance of his duty.

The learned counsel for petitioners contends that section 217 is mandatory and that, upon a finding of fact that school directors have been guilty of failing to comply with the mandatory provisions of the several sections of the code in question, judgment of ouster must be entered against them as a matter of law. He asks us to affirm a conclusion of law as follows:

"2. That section 217 of the School Code of 1933 is mandatory and if the court finds as a fact that school directors have been guilty of violating the plain provisions of the act judgment of ouster must be entered against them."

With this contention the trial judge cannot agree. The language of the section itself seems to confer upon the court in such case the right to exercise a sound discretion in the enforcement of the drastic provision for removal.

After prescribing the procedure by which a petition for removal is brought to a hearing, the section goes on to say:

". . . and if on such hearing . . . the court shall be of the opinion that any duty imposed on said board of school directors, which is by the provisions of this act made mandatory upon them to perform, has not been done or has been neglected by them, the said court shall have the power to remove said board, or such of its number as in its opinion is proper . . ."

This language has been construed on numerous occasions. The consensus of opinion of all the courts seems to be that the court has the duty of exercising a sound discretion and, in so doing, may refuse to remove a school director, even though he has failed to comply with all the mandatory provisions of the code if, in the judgment of the court, the technical violations of the mandates of the code have not been motivated by an intent to defraud or corrupt, and the violations have not resulted in financial loss to the school district.

If, in the judgment of the court, the removal of an entire board of directors that has mistakenly failed to carry out all the mandatory provisions of a voluminous school code will result in leaving the affairs of the school district in a more or less chaotic condition, the court may exercise the discretion reposed in it by refusing to impose the severe penalty provided in the act. Violations which result from mistaken judgment on the part of the directors and which have not caused harm to the taxpayers of the district in any manner need not be punished by so severe a penalty as removal from office: Summit Hill School Directors, 258 Pa. 575, 578, 579; In re Tremont Township School Directors, 34 D. & C. 623, Palmer, J.

Perhaps the most recent consideration, by our Supreme Court, of this question of discretion is found in Jenkins Township School Directors' Removal Case, 344 Pa. 267, in an opinion by Mr. Justice Maxey, handed down on March 23, 1942. Speaking of the failure of the directors whose removal was sought to comply with a mandatory provision of the code as to maintenance of a sinking fund, he says (p. 276) :

"While this would not be a legally valid excuse for breach of the duty prescribed by section 519 . . . it would nevertheless be a proper matter for a court to consider on a petition for the removal of school directors. It would throw light on the question whether the school board was wilfully violating the applicable pro-

vision of the School Code or whether it was acting in good faith and honestly believed that all that the law required was to maintain in the sinking fund sufficient to meet the payments of all bonds and coupons which according to the experiences of former years would likely be presented for payment. *Even for a breach of a mandatory duty under the School Code, a court is not required to remove a board of directors; it is simply empowered to do so.* In *White et al.* v. *Moore et al.,* 288 Pa. 411, 417, 136 A. 218, this court in reversing the decree of the court below which removed school directors said: 'To deprive a person of office because of failure to follow mandatory duties prescribed by statute, the further result of which is also to deprive him of eligibility for the same office for a period of five years, is a drastic procedure and before such penalty is imposed there should be at least clear proof of breach of duty.' " (Italics supplied.)

After careful consideration of all the charges and the testimony adduced, the trial judge concludes that the irregularities complained of and proven at trial are not of such a character as to warrant or require the removal of the directors involved. In this conclusion, it is not to be understood that we are giving sanction to any of the methods employed that are not in strict accordance with the provisions of the code. On the contrary, such practices are condemned, but in the present instances are held not to involve fraud or wilful disregard of law, and the irregularities complained of have resulted in no financial loss to the district: In re Removal from Office of O'Connell et al., 23 Luz. L. R. 447, 450.

The practices adopted by respondents and made the basis of the complaint in this case are not to be regarded as approved and must, in the future, be discontinued. The dismissal of the petition to remove them must not be construed by the directors as a condonation of the irregularities committed by them in their official ca-

pacity. In fact, the refusal of the prayer of the petition to remove them is based entirely upon the impression growing out of the facts found in the record that led us to believe that respondents did not wilfully neglect to perform their mandatory duties, nor did they act with intent to defraud the district or themselves to profit thereby. There was no proof presented from which it could be found that the district suffered any pecuniary loss as a result of the irregularities.

It is proper to discuss the two principal incidents in which we have found as a fact that the entire number of directors on this board failed in the performance of a mandatory duty.

First: The furnishing of coal to the several buildings of the school district for the school year 1939-1940.

Very properly the board advertised for bids for furnishing coal to the 16 different school buildings of the township for the year 1939-1940. All the bids received as a result of this advertisement were rejected. A second advertisement was made. As a result of this second advertisement, a number of bids was received. Hobart Humbertson submitted the lowest bid. It was accepted and the solicitor was authorized to prepare a contract and bond. The successful bidder could not furnish sureties in execution of the bond. While he was making an effort to find proper sureties, he failed to execute the contract, but furnished coal at the price specified in his bid until December 18, 1939, when he defaulted.

Instead of readvertising for bids in the effort to negotiate a new contract, the board authorized its teachers, principals, and janitors to order coal when needed for the several school buildings in the township. In this manner coal was ordered from various dealers, the cost of which aggregated $1,692.46.

This failure to advertise for bids and to make a new contract for the furnishing of coal violated the manda-

tory provision of section 708 of the code, which is as follows:

"All supplies of the second class, costing three hundred dollars or more, shall be awarded and purchased only after public notice has been given by advertisement, published once each week for three weeks in not less than two newspapers of general circulation."

There was likewise a failure to observe the provisions of section 403:

"The affirmative vote of a majority of all the members of the board of school directors in every school district in this Commonwealth, duly recorded, showing how each member voted, shall be required in order to take action on the following subjects: . . .

"Entering into contracts of any kind, including the purchase of fuel or any supplies, where the amount involved exceeds one hundred dollars."

We do not find as a fact that the members of the board wilfully made or authorized purchases of coal in different quantities at different times for different school buildings with a view to evade the provisions of the law requiring advertisements for bids and contracts. We incline rather to the opinion that the different members of the board failed to exercise proper diligence in finding out that Humbertson had defaulted his contract and in assuming that, since such contract had been authorized, coal could be furnished for the balance of the season in piecemeal.

This mistaken notion, according to the testimony, did not increase the cost of coal to the district, inasmuch as the individual bills rendered and later paid to the parties furnishing the coal were not in excess of the amount fixed in the accepted bid of Humbertson. The contention made at oral argument by respondents that school districts, such as German Township, need not advertise for bids for furnishing fuel, but may procure coal as needed from any or all dealers, cannot be accepted as compliance with the law. Where a board

knows, by actual experience, that the annual supply of coal will largely exceed the sum fixed in the code, there may not be failure to secure bids by advertisement and failure to enter into a contract with the lowest bidder for the entire annual supply.

Second: The creation and activities of the athletic board of control.

Here we find a very interesting and somewhat controversial question for consideration. Respondents, as members of the school board, have proceeded upon the theory that athletic activities, high school band organizations, and other extra-curricular activities may be entirely segregated from the supervision and control of the board as a board. They contend that they may delegate to an appointive athletic control board all jurisdiction over the activities mentioned, and the handling of the finances incident to such management. They insist that the purchase of equipment for athletic teams and uniforms for the high school band and the expenditure of the proceeds arising from these activities are entirely a matter for the athletic board of control without any supervisory action over the conduct of this committee by the board as a whole. The members of the board who are not members of the athletic board of control seek to absolve themselves from their failure to exercise supervision by testifying that they are completely without knowledge of the financial transactions involved in the equipment of the athletic teams and the furnishing of uniforms for the band. Accepting this theory, the board of control deposited the proceeds of the athletic games in a bank, not a depository, and checked out the fund in payment of bills for these departments without any attempt to comply with the provisions of the code as to the manner of authorizing and making payments by the school board. In short, the funds arising from this form of extra-curricular activities never reach the treasury of the

school board, nor is the account audited by the township auditors.

Thus we find that, on February 12, 1940, the board, as a board, authorized and drew a voucher in payment of a bill of Dice-Spalding Company, amounting to $965.30, on account of the bill of that company for athletic supplies and equipment, for use in games taken part in or played by pupils as members of the football team of the high school of the German Township School District. This bill was paid without advertisement for bids, receipt of such bids, or letting of a contract. It was paid simply because the athletic board of control or persons authorized by it had purchased equipment for the football team for the payment of which there appears not to have been sufficient money in the account of the athletic board of control at its bank.

During the school year of 1940-1941, the athletic board of control bought from D. Klein & Bros., Inc., through its agent, John Trump, uniforms for the high school band, costing $1,531.40. The check in payment of this item was drawn by the athletic board of control by O. R. Younkin, treasurer, on the Second National Bank of Masontown.

The members of the school board, not members of the athletic board of control, divorce themselves entirely from any act or responsibility in connection with this item of equipment.

This entire lack of supervision and control of these extra-curricular activities is sought to be excused because of the adoption of the resolution quoted at length in the seventh finding of fact. That resolution seems to be based on section 405 of the School Code of May 18, 1911, P. L. 309.

"The board of school directors in every school district of the first or second class shall, and in every district of the third or fourth class may, prescribe,

adopt, and enforce such reasonable rules and regulations as it may deem proper, regarding the management, control, or prohibition of exercises, athletics, or games of any kind, taken part in or played by any pupils as members of or in connection with any public school . . . and may provide for the suspension, dismissal, or other reasonable penalty in the case of any superintendent, teacher, appointee, employee, or pupil who violates any of such rules and regulations."

The language of this section in no sense serves to divorce the athletic and musical organizations of the high school from the other departments of the public schools. It cannot be construed as clothing a board of athletic control with supreme authority over the finances required to conduct these departments. The members of the band, who receive instructions in playing the various instruments used in such an organization, and who take part in the varied exercises that take place on the football field, particularly between the halves of the game, are as much a part of the student body as are those who specialize in intellectual achievements.

The comparatively small number of athletically inclined boys who survive the rigors of the training period and carry the colors of the school on the football field are not to be regarded as separate from the great body of pupils in the public schools who are not able, or do not choose, to participate in this line of endeavor.

If this selected few acquiring such special skill in the playing of the game of football, and the relatively small number of pupils who comprise the high school band, by their combined efforts are able to attract large crowds of spectators who are willing to pay substantial admission prices for the entertainment furnished, such students and such activities may not be regarded as a separate institution, subject only to the supervision of the athletic board of control. They constitute a unit or department of the entire school system. They re-

ceive no part of the prices of admission. They do not perform for the athletic board of control. They carry on for alma mater. The proceeds of these activities belong to the board of school directors and must be accounted for in the same manner that other funds of the school district are accounted for.

The legal status of these activities and the duty of the board of school directors with reference thereto have been clearly stated by Mr. Justice Stern, in the case of Galloway v. Prospect Park Borough School District, 331 Pa. 48, 50:

"Section 401 of the Act of May 18, 1911, P. L. 309, provides that 'The board of school directors in every school district in this Commonwealth . . . may establish, equip, furnish, and maintain the following . . . departments for the education and recreation of persons residing in said district, which said . . . departments, when established, shall be an integral part of the public school system in such school district, and shall be so administered, namely: . . . Gymnasiums, Playgrounds, . . .' Section 701 provides: 'The boards of school directors of each school district in this Commonwealth shall purchase all necessary furniture, equipment, text-books, school supplies, and other appliances for use of the public schools, or any department thereof, in their respective districts, and furnish the same free of cost for use in the schools in said districts, subject to such rules and regulations regarding the use and safe keeping thereof as the boards of school directors may adopt.' The purchase of 'equipment' and 'other appliances' for use in school gymnasiums and playgrounds is thus clearly authorized. As for the term 'school supplies,' this is defined in section 706 as including, inter alia, 'maps, globes, and all other supplies, except text-books, necessary for school use.' Physical education is as much a part of the school curriculum as are subjects of intellectual study, and

athletic supplies, therefore, are as 'necessary for school use' as maps, globes, and similar objects. It is not the spirit of our public school system that only children with financial means to purchase their own supplies should have the opportunity of participating in school games and athletic sports. Of course, the extent to which athletic paraphernalia should be purchased for use merely by school teams playing in competitive sports is a question to be answered by school boards in the exercise of a cautious discretion, with special reference to the proportionate number of those who will receive the benefit of such supplies."

This cautious discretion cannot be exercised by an attempt, in the form of a resolution, to delegate to an athletic board of control the entire subject of extra-curricular activities. The requirement that supplies exceeding in cost a certain amount shall be advertised for, and the contract for their furnishing let to the lowest bidder applies to all such supplies as those furnished for the football team and the band uniforms.

The provision of section 403 of the code that requires the names of the directors and the manner in which they voted to be recorded in the letting of contracts for such supplies is also applicable to the transactions mentioned. When a director testifies that he knows nothing about the transactions delegated to the athletic board of control, he admits himself negligent in the performance of his statutory duty. It is a mandatory duty that the board shall supervise, control, and comply with the statutory provisions, as to all receipts and expenditures undertaken by the athletic board of control.

Failure to observe these statutory directions and failure to see that funds so collected are expended only in accordance with the provisions of the code constitutes a violation of section 516 of the School Code of May 18, 1911, supra:

"The board of school directors in every school district in this Commonwealth shall have the right to use and pay out, in the manner herein provided, any funds of the district for any and all of the purposes herein provided, subject to all the provisions of this act. The use or payment of any public school funds of any school district in this Commonwealth, in any manner or for any purpose not provided in this act, shall be illegal."

The school board may hereafter continue to permit the athletic board of control to manage and direct extracurricular activities, but all moneys received therefrom and all expenditures for equipment to be used therein, must be reported to and approved by the board of directors as a board. The board of athletic control must be considered merely as a committe, with like powers and duties as the teachers' committee, the committee on supplies, or the building committee.

As in the failure to observe the provisions of the code in the furnishing of coal, so here there is no evidence that any director acted from a corrupt motive or in fraud of the rights of the taxpayers of the school district, nor that there was any contemplation or receipt of profit by any director from the manner in which the athletic finances were handled. We attribute this failure on the part of the directors to an error in judgment as to the effect of the resolution quoted in finding seven, and therefore absolve the individual members of the board from any wilful failure to comply with the mandatory provisions of the code. . . .

### Order

Now, November 19, 1942, after hearing, and upon consideration, it is ordered and directed nisi, as follows:

1. The rule to show cause why Ira Riffle, O. R. Younkin, E. C. Stillwell, A. B. Gault, J. H. Sangston, John Dick, and Clarence Davis should not be removed from office is discharged and dismissed.

2. The School District of German Township shall pay the costs of this proceeding.

3. The prothonotary shall give immediate notice of this order to the parties or their counsel and they are allowed 10 days from the date hereof in which to file exceptions.